989 P.2d 960 (1999)
1999 OK CR 22
Curtis Lee WASHINGTON, Appellant,
v.
STATE of Oklahoma, Appellee,
No. F-96-1560.
Court of Criminal Appeals of Oklahoma.
May 7, 1999.
*966 Bob G. Carpenter, Phil Winters, Oklahoma City, OK, Attorneys For Appellant at trial.
Robert Macy, District Attorney, Fern Smith, Assistant District Attorney, Oklahoma City, OK, Attorneys for the State at trial.
Sandra Mulhair Cinnamon, Katherine Jane Clark, Capital Direct Appeals Div. Okla. Indigent Defense System, Norman, OK, Attorneys for Appellant on appeal.
W.A. Drew Edmondson, Attorney General of Oklahoma, Robert Whittaker, Assistant Attorney General, Oklahoma City, OK, Attorneys for Appellee on appeal.
*965 STRUBHAR, Vice Presiding Judge:
¶ 1 Curtis Lee Washington, hereinafter Appellant, was tried by jury and convicted of Murder in the first degree (21 O.S.1991, § 701.7(A)), in the District Court of Oklahoma County, Case No. CF-96-1023, the Honorable Leamon Freeman, District Judge, presiding. The jury recommended death after finding the murder was especially heinous, atrocious or cruel,[1] and the trial court sentenced Appellant accordingly. From this Judgment and Sentence, he appeals.[2] After thorough consideration of the record before this Court, we find the combination of three serious errors in the second stage of trial rendered the death sentence imposed in this case unreliable. Thus, we affirm Appellant's conviction and modify his sentence to life without the possibility of parole.[3]

FACTS
¶ 2 On February 2, 1996, Appellant shot to death his ex-wife, Celia Washington, at the White Bright Laundry in Bethany, Oklahoma. Washington had been working at the laundry for approximately two months. Co-worker, Allen Smith, testified Washington said on the morning of the murder that she feared Appellant would come to the laundry and hurt her. Smith stated that no sooner had Washington uttered that statement than she remarked "Oh, my God, here he comes." Washington gave Smith a quarter, instructed him to call 9-1-1 and locked herself inside the small inner office. As Appellant entered the laundry, Smith dialed 9-1-1 and was able to convey to the police dispatcher there was an emergency. Smith then retrieved his personal clothes from a dryer and walked to his apartment next door. Smith claimed Appellant followed him out the door and down the sidewalk and stood there until Smith went into his apartment. Appellant then walked back into the laundry.
¶ 3 Sergeant Paul Jestice responded to the 9-1-1 call and arrived at the laundry within approximately four minutes. As Jestice pulled into the parking lot, he saw Appellant exit the laundry and get in his vehicle to leave. Jestice notified Officer James Hillis, who was not far behind, and told Hillis to follow Appellant while Jestice went inside the laundry to investigate. Jestice found Washington's body inside the office under a table. She had been shot eight times and showed no signs of life. Meanwhile, Hillis followed Appellant as he drove to the police department. There Hillis took Appellant into custody and secured the gun Appellant had in his pocket.
¶ 4 At trial, Appellant testified that he and Washington had maintained contact throughout their separation and divorce. He claimed he went to the laundry that morning to give Washington some money and to see her. When Washington told Appellant she did not love him any longer and wanted nothing to do with him, Appellant said his feelings of hurt, anger, rejection, sorrow and loneliness overcame him. Appellant said he never intended to kill Washington, but that something took over and he could not recall specifics of the actual shooting. Other facts will *967 be discussed as they become relevant to the propositions of error raised for review.

PRE-TRIAL ISSUES
¶ 5 In his sixteenth proposition of error, Appellant claims he was denied his right to a jury trial on the issue of his competency to stand trial. On June 7, 1996, the trial court issued an order stating that a doubt had been raised as to Appellant's competency and directing that he be examined. After Appellant had been examined by Dr. Edith King and a report prepared, the State filed an application for a post-examination competency hearing. The hearing was set for July 24, 1996. At the non-jury hearing, defense counsel announced ready and challenged Dr. King's report. Because Dr. King was unavailable, the hearing was continued to July 29, 1996. At the July 29th hearing, defense counsel again announced ready and both parties examined Dr. King who found that Appellant was competent to stand trial. At the conclusion of the hearing, the trial court found Appellant was competent, ordered the proceedings to resume and set a trial date. Defense counsel then announced that he intended to request a jury trial on the issue of Appellant's competency. The prosecutor objected on the basis that a non-jury trial had already been conducted and that if Appellant had wanted a jury trial on the issue of his competency, he should have asked before the bench trial had begun. The trial court denied Appellant's request.
¶ 6 The statutory right to a jury trial in a post-examination competency hearing must be demanded or it will be conducted before the court. Miller v. State, 1988 OK CR 29, ¶ 11, 751 P.2d 733, 737. In the instant case, we find Appellant failed to timely assert his statutory right to a jury trial and therefore the trial court did not err in denying his untimely request. Accordingly, this proposition of error is denied.
¶ 7 In his seventeenth proposition of error, Appellant contends the trial court erred in finding Appellant competent because it did not find Appellant possessed a rational as well as factual understanding of the proceedings. This argument has been consistently rejected by this Court and we find no need to revisit it at this time. Tate v. State, 1995 OK CR 24, ¶ 17, 896 P.2d 1182, 1188; Perry v. State, 1995 OK CR 20, ¶¶ 21-23, 893 P.2d 521, 526.

JURY SELECTION ISSUES
¶ 8 In his second proposition of error, Appellant argues the trial court improperly excused seven potential jurors for cause based on their opposition to the death penalty without first ascertaining whether these prospective jurors could set aside their personal objections and follow the law and the court's instructions. Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
¶ 9 This Court has consistently held the decision whether to disqualify a prospective juror for cause rests in the trial court's sound discretion whose decision will not be disturbed unless an abuse of discretion is shown. E.g. Douglas v. State, 1997 OK CR 79, ¶ 7, 951 P.2d 651, 659, cert. denied, ___ U.S. ___, 119 S.Ct. 195, 142 L.Ed.2d 159 (1998). When reviewing the voir dire examination of potential jurors who are unclear or equivocal about their ability to consider the death penalty, this Court traditionally defers to the impressions of the trial court who can better assess whether a potential juror would be unable to fulfill his or her oath. Id. However, we have consistently recognized that "[r]emoval for cause of even one venire member who has conscientious scruples against the death penalty but is nevertheless able to set aside those scruples and consider the penalty of death and is therefore eligible to serve on the jury is error of constitutional magnitude not subject to harmless error analysis." Scott v. State, 1995 OK CR 14, ¶ 10, 891 P.2d 1283, 1289, cert. denied, 516 U.S. 1077, 116 S.Ct. 784, 133 L.Ed.2d 735 (1996) (citing Gray v. Mississippi, 481 U.S. 648, 668, 107 S.Ct. 2045, 2057, 95 L.Ed.2d 622, 638 (1987)).
¶ 10 During voir dire, the trial court advised prospective jurors there were three possible punishments for a conviction of first degree murder: life; life without parole; and *968 death. The trial court then asked each prospective juror substantially the same question, "[i]f you are a member of this jury can you and will you give meaningful and thoughtful consideration to all three of the possible punishments?" The seven prospective jurors about which Appellant complains responded they could not consider the death penalty under any set of circumstances. As we stated in Douglas, 1997 OK CR 79, at ¶ 8, 951 P.2d at 660, "[b]y stating they could not consider the death penalty under any circumstances, the prospective jurors advised the trial court they could not put aside their beliefs and follow the law and the court's instructions." Although the trial court in the instant case did not ask the precise question prescribed by OUJI-CR2d 1-5 Alternate 2, the inquiry made by the trial court was sufficient to comply with Witherspoon and Witt. Accordingly, we find no error occurred when the trial court excused these prospective jurors for cause without further inquiry after these jurors stated unequivocally that there was no set of circumstances under which they could impose the death penalty. Douglas, 1997 OK CR 79, at ¶ 8, 951 P.2d at 660.

FIRST STAGE ISSUES
¶ 11 In his third proposition of error, Appellant claims the trial court violated his constitutional rights by failing to administer his requested instructions on first degree heat of passion manslaughter. Because Appellant requested first degree heat of passion manslaughter instructions, this issue has been properly preserved for review.
¶ 12 A defendant is entitled to a lesser included offense instruction only when there is reasonable evidence to support it. Valdez v. State, 1995 OK CR 18, ¶ 52, 900 P.2d 363, 378, cert. denied, 516 U.S. 967, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995). "The trial court must determine as a matter of law whether the evidence presented at trial is sufficient to justify an instruction on a lesser included offense." Id. Any doubt regarding the credibility of the evidence "must be resolved in favor of administering the instruction." Id. "The failure to give lesser included offense instructions supported by the evidence constitutes reversible error." Id. This Court must therefore determine in the instant case if the evidence reasonably supported a heat of passion manslaughter instruction.
¶ 13 A review of the record shows the trial court correctly declined to administer first degree heat of passion manslaughter instructions in the instant case because there was no evidence of adequate provocation,[4] a necessary element of heat of passion manslaughter.[5] No error occurs from the lack of heat of passion manslaughter instructions where there is no evidence of victim provocation and the requisite resulting emotional response of the perpetrator. Charm v. State, 1996 OK CR 40, ¶ 9, 924 P.2d 754, 760, cert. denied, 520 U.S. 1200, 117 S.Ct. 1560, 137 L.Ed.2d 707 (1997). In the instant case, Appellant went to the victim's place of employment and broke into the office area after the victim locked herself inside and told Appellant she did not love him anymore. Appellant cannot claim that the *969 victim's attempts to resist his assault or advances once he broke into the sanctum of the secured office constitutes adequate provocation to justify heat of passion manslaughter instructions. As such, we find the trial court did not err in refusing to administer first degree heat of passion manslaughter instructions.
¶ 14 In his fourth proposition of error, Appellant claims the second degree murder instructions administered in his case were defective and merit reversal. Because Appellant failed to object to the trial court's second degree murder instructions, we will review this claim for plain error. Cannon v. State, 1998 OK CR 28, ¶ 34, 961 P.2d 838, 849.
¶ 15 Appellant complains Instruction No. 20 listing the elements of second degree depraved mind murder was erroneous. Instruction No. 20 provided in pertinent part that murder is murder in the second degree when "the conduct [of the defendant] is not done with the intention of taking the life of or harming any particular individual." (emphasis added) Appellant relies on Willingham v. State, 1997 OK CR 62, ¶ 25, 947 P.2d 1074, 1081, cert. denied, 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998), in which this Court held the fact that a defendant intended to harm a particular victim does not preclude a conviction of second degree depraved mind murder. The Willingham court noted the uniform instruction should be modified to reflect this holding and that the fifth element of the second degree depraved mind murder instruction should provide "the conduct is not done with the intention of taking the life of any particular individual." Id. The trial in the instant case was held prior to our holding in Willingham and the trial court administered the uniform instruction.
¶ 16 While the instruction administered in the instant case is error under Willingham, reversal is not warranted because the jury never considered the option of second degree murder. The jury was instructed to consider whether Appellant was guilty of first degree murder and if they entertained a reasonable doubt that Appellant was guilty of first degree murder only then should they consider second degree murder.[6] Because we presume the jury followed the instructions and the jury found Appellant guilty of first degree murder, we find the error in the instructions had no effect since the jury did not consider second degree murder. Willingham, 1997 OK CR 62, at ¶ 32, 947 P.2d at 1082. Therefore, this proposition is denied.
¶ 17 In his fifth proposition of error, Appellant claims it was reversible error to admit: 1) the medical examiner's opinion that the victim's wounds would have been painful; 2) Detective Reid's opinion that Appellant was not in shock after the shooting; and 3) Sgt. Jestice's opinion that the victim crawled under the table as Appellant shot her. He maintains such opinions were beyond the field of training or expertise of these witnesses and therefore such opinions were inadmissible, incompetent and prejudicial. McCarty v. State, 1988 OK CR 271, ¶ 8, 765 P.2d 1215, 1219 and 12 O.S.1991, §§ 2702 and 2403.
¶ 18 At trial the medical examiner was asked if the victim's wounds would have been painful. The medical examiner responded, "Well again, there is only one person that could answer that, that would be Mrs. Washington. But again, I would see no reason that they would be somewhat painful; yes, sir." Appellant claims the question of whether a wound is painful is so subjective that the medical examiner's opinion is nothing more than speculation. Because defense counsel failed to object to this statement, we will review for plain error.
¶ 19 The medical examiner was qualified and testified as an expert in determining the manner and cause of the victim's death. Rather than testifying as an expert, the medical examiner's testimony concerning whether the victim's wounds would have been painful was offered as an opinion or inference as a lay witness. The statement or opinion did not require any more knowledge than that which is commonly possessed by any lay *970 person who has sustained physical injuries. Such testimony was incidental to his expert analysis of the cause and manner of death and was permissible under 12 O.S.1991, § 2701, which allows opinion testimony by lay witnesses which is rationally based on the perception of the witness and is helpful in the determination of a fact in issue. Lee v. State, 1983 OK CR 41, ¶ 35, 661 P.2d 1345, 1354. Simply because a witness testifies in the capacity of an expert does not preclude him or her from rendering a lay opinion on other matters. See Id.
¶ 20 In this case, the medical examiner had seen the wounds inflicted by Appellant and surmised, as any lay person could after seeing the wounds, that the eight gunshot wounds sustained by the victim would have been somewhat painful and only the victim could render the definitive opinion. Although this opinion doubtlessly did little in the way of aiding the jury since it stated what many would perceive as an obvious fact, such testimony was relevant to prove the especially heinous, atrocious or cruel aggravating circumstance and whether the victim suffered prior to her death. We further find the probative value of this lay opinion from such an expert witness was not outweighed by the danger of unfair prejudice and no error occurred in its admission.
¶ 21 Next, Appellant argues he was prejudiced by Detective Reid's opinion that he did not exhibit any of the classic signs of shock. The question of whether or not a lay witness is qualified to render an opinion is a preliminary determination within the sound discretion of the trial court whose decision will not be disturbed unless clearly erroneous or a clear result of an abuse of discretion. Bechtel v. State, 1987 OK CR 126, ¶ 10, 738 P.2d 559, 561.
¶ 22 This Court has held that lay witnesses may not give an opinion calling for a medical diagnosis. Doyle v. State, 1989 OK CR 85, ¶ 12, 785 P.2d 317, 322. Shock is a generally understood state of being and not necessarily always a medical condition. In the instant case Detective Reid testified that Appellant exhibited no signs of shock and sat at the police station like "any normal person" showing no emotion at all. On cross-examination, Detective Reid testified that he had no medical training and that people he had observed who exhibited signs of shock either cried hysterically or sat and stared blankly, sometimes fainting. He further stated that he had not seen anyone who was in shock appear "perfectly normal." Reid admitted that different people exhibit different signs of shock and that he did not know what signs Appellant exhibited immediately after the shooting because he did not see Appellant until three hours later. Assuming arguendo Detective Reid's opinion was inadmissible, any error was cured by his testimony explaining Appellant's demeanor as compared to other individuals Reid perceived as exhibiting signs of shock. Accordingly, we find Appellant was not prejudiced by the admission of Reid's opinion.
¶ 23 Lastly, Appellant argues he was prejudiced by Sgt. Jestice's opinion that the victim "crawled up underneath the table." Because there was no evidence Sgt. Jestice was an expert in crime scene reconstruction or evidence representation, Appellant maintains that his opinion was inadmissible. Appellant also claims Sgt. Jestice's opinion impermissibly invaded the province of the jury. As stated above, 12 O.S.1991, § 2701 allows opinion testimony by lay witnesses which is rationally based on the perception of the witness and is helpful in the determination of a fact in issue. Lee, 1983 OK CR 41, at ¶ 35, 661 P.2d at 1354. "Lay witness testimony should only be rejected when not rationally based on the witness' perception." Hall v. State, 1988 OK CR 53, ¶ 13, 751 P.2d 1091, 1093. Sgt. Jestice was the first to arrive on the scene after the shooting. He found Washington in the office underneath a table and visibly injured. To render aid, he had to move Washington's body and as such he was the only person who saw Washington's position underneath the table. His opinion that she crawled there was rationally based on his perception after seeing Washington as he found her underneath the table. Because his opinion was proper lay witness opinion and no expertise was required, no error occurred in its admission. Further, his opinion did not improperly invade the province of the jury as *971 it was based on his investigation of the scene and did not tell the jury what result to reach. See Cannon, 1998 OK CR 28, at ¶ 20, 961 P.2d at 846. Accordingly, this proposition is denied.
¶ 24 In his sixth proposition of error, Appellant claims the trial court erred in admitting photographs of the victim, diagrams of the scene, cartridges, bullets and photographs of same, the search warrant and return and all of the blood evidence. Because Appellant failed to object to the admission of any of this evidence, we will review for plain error. Perry, 1995 OK CR 20, at ¶ 41, 893 P.2d at 531.
¶ 25 "This Court will not disturb a trial court's decision to admit evidence absent a clear abuse of discretion accompanied by prejudice." Douglas, 1997 OK CR 79, at ¶ 55, 951 P.2d at 669. Photographs and other physical evidence are admissible if relevant and the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. Cannon, 1998 OK CR 28, at ¶ 25, 961 P.2d at 847. See also 12 O.S.1991, § 2403.
¶ 26 Eleven different color photographs of the victim were introduced in this case, six of which depicted the victim at the crime scene from different angles and five which illustrated the victim's wounds. (St.'s Exh. 10-16, 25, 26, 28, 32) Appellant's claim that the photographs were not relevant as the cause of death was not contested has been rejected consistently by this Court. E.g. Neill v. State, 1994 OK CR 69, ¶ 41, 896 P.2d 537, 551, cert. denied, 516 U.S. 1080, 116 S.Ct. 791, 133 L.Ed.2d 740 (1996). Although a defendant may not contest the victim's cause of death, the State retains the burden to prove the corpus delicti. "Pictures of the murder victim are always useful in establishing the corpus delicti of the crime." Neill, 1994 OK CR 69, at ¶ 41, 896 P.2d at 552. Further, these photographs were relevant as they showed the nature, extent, and location of the wounds and corroborated the medical examiner's testimony. The fact that Sgt. Jestice had moved the body from its original position to render aid did not make the subsequent photographs of the body inadmissible. The jury was fully apprised that the body had been moved from its original position underneath the table and that the photographs showed Washington after Sgt. Jestice attempted to render aid. The admission of the other physical evidence or photographs thereof including the diagrams, the shell casings and bullets, the search warrant and return, the vial of blood from the victim, the blood on Appellant's jacket and gun, was relevant and corroborated the testimony of the investigating officers. Because the evidence was relevant and properly admitted, we find no error.
¶ 27 In his seventh proposition of error, Appellant claims his warrantless arrest was illegal and that all the evidence seized pursuant to his illegal arrest should have been suppressed.
¶ 28 "A police officer may make a warrantless arrest of a person if the officer has probable cause to believe that the arrestee has committed a felony." Davis v. State, 1990 OK CR 20, ¶ 21, 792 P.2d 76, 84. "If at the time of arrest the facts and circumstances within the arresting officer's knowledge and of which he had reasonable trustworthy information were sufficient to warrant a prudent man in believing that an offense had been or was being committed, probable cause is established and the arrest is lawful." Id.
¶ 29 In the instant case, Officer Hillis testified that he was dispatched to the White Bright Laundry following a 9-1-1 emergency call. Sgt. Jestice was first to arrive and as he pulled into the parking lot, he saw Appellant exit the laundry and get in his vehicle to leave. Jestice advised Officer Hillis, who was not far behind, to follow Appellant while Jestice went inside the laundry to investigate. As Officer Hillis followed Appellant, he heard Jestice advise over the police radio that a "subject was down" which normally meant "injury." Jestice also advised that Appellant would have a gun. At that point Hillis realized there was "definitely some type of injury to the subject down and that [he] was more than likely following the suspect." Shortly thereafter, Hillis heard Jestice call for an ambulance, the fire and rescue squad, the detectives and the *972 medical examiner. This told Hillis there was a death and he knew at that point he would initiate a felony stop once back-up was in place. Appellant turned into the police department parking lot and Hillis initiated the felony stop where he ordered Appellant out of his car and told him to "throw out" his gun. Appellant followed Hillis' instructions with the exception of relinquishing his gun. As Hillis handcuffed Appellant and asked for the gun again, Hillis saw the gun barrel protruding from Appellant's pocket as Appellant said it was in his pocket. Hillis seized the gun. The information available to Officer Hillis at the time he initiated the stop and arrested Appellant as stated above was sufficient to warrant a prudent person in believing that Appellant had committed a felony. As such, we find the warrantless arrest was lawful and the evidence obtained therefrom was properly admitted.
¶ 30 Appellant also challenges the admission of several unwarned statements he made. Because Appellant failed to object to the admission of these statements, this Court will only review for plain, reversible error. Lewis v. State, 1998 OK CR 24, ¶ 33, 970 P.2d 1158, 1170.
¶ 31 While Officer Hillis was filling out his report, Appellant volunteered, "Hey, could you tell me something? Did she survive?" Hillis advised Appellant that he did not know and told Appellant not to say anything else until he had received his Miranda[7] warnings. As Detective Reid was about to check Appellant's hands for gunpowder residue, he asked Appellant whether he would mind. Appellant responded, "well, you're going to do it any way." When asked if Appellant was left or right handed, Appellant said, "figure it out."
¶ 32 Appellant's voluntary question to Officer Hillis asking about the status of Washington was not the result of custodial interrogation and therefore no Miranda violation occurred. The Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. McCaulley v. State, 1988 OK CR 25, ¶ 9, 750 P.2d 1124, 1127. The record shows that Appellant initiated the conversation with Officer Hillis that he now complains should have been suppressed at trial. Because Appellant was not subjected to custodial interrogation and no Miranda warnings were required at the time he made his voluntary statement, no error occurred in the admission of this unwarned remark.
¶ 33 The record is unclear whether Appellant received Miranda warnings prior to making his statements to Detective Reid. Even if these statements were made without the benefit of Miranda warnings, their admission, though error, is harmless beyond a reasonable doubt in light of the fact that Appellant testified at trial admitting he shot Washington and the evidence against Appellant was strong as to guilt. Lewis, 1998 OK CR 24, at ¶ 37, 970 P.2d at 1171.
¶ 34 Lastly, Appellant claims it was error to admit his statements to Hillis and Reid without a Jackson v. Denno[8] hearing. "A defendant does not have the right to a Jackson v. Denno hearing as to the voluntariness of his inculpatory custodial statements where he does not object to the admission of the statements." Humphreys v. State, 1997 OK CR 59, ¶ 18, 947 P.2d 565, 573, cert. denied, ___ U.S. ___, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998). See also Wainwright v. Sykes, 433 U.S. 72, 86, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977). Because Appellant did not object to the voluntariness of his custodial statements, the trial court properly admitted the statements without a Jackson v. Denno hearing and no error occurred. See Wainwright, 433 U.S. at 86, 97 S.Ct. at 2506.
¶ 35 In his eighth proposition of error, Appellant argues he was prejudiced by the admission of statements made by the victim to her employer and co-worker about Appellant *973 and her relationship with him. Appellant claims these statements constitute inadmissible hearsay and do not fall within the state of mind exception.
¶ 36 At trial, Allen Smith, Washington's co-worker, testified that Washington seemed nervous on the day of the murder and told him that she was afraid that Appellant might come to the laundry and hurt her. Washington then saw Appellant coming and said, "oh, my God, here he comes." Washington gave Smith a quarter and instructed him to call 9-1-1. Washington's statement to Smith that she was afraid Appellant would hurt her was properly admitted under the state-of-mind exception. 12 O.S.1991, § 2803(3). Testimony showing ill feeling, threats, or similar conduct by one spouse toward another in a marital homicide case is relevant and statements by the deceased expressing fear of a spouse are admissible under the state of mind exception to the hearsay rule. Duvall v. State, 1991 OK CR 64, ¶ 6, 825 P.2d 621, 626, cert. denied, 506 U.S. 878, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992). See also Cannon, 1998 OK CR 28, at ¶ 23, 961 P.2d at 846-47; Long v. State, 1994 OK CR 60, ¶ 25, 883 P.2d 167, 173, cert. denied, 514 U.S. 1068, 115 S.Ct. 1702, 131 L.Ed.2d 564 (1995). Washington's statement "oh, my God, here he comes" and her statement instructing Smith to call 9-1-1 were properly admitted under either the present sense impression or the excited utterance exception to the hearsay rule. See 12 O.S.1991, §§ 2803(1) & (2).
¶ 37 Betty Boyce, Washington's employer, testified Washington told her she feared Appellant because he was insistent she resume using her maiden name to prevent her from getting part of a large amount of money he had recently received. This statement was properly admitted under the state of mind exception to the hearsay rule as discussed above. The other statements about which Appellant complains were elicited by him during cross-examination. Even if these statements were inadmissible hearsay, Appellant cannot profit from it for it is his own invited error. Ledbetter v. State, 1997 OK CR 5, ¶ 57, 933 P.2d 880, 897. Because the hearsay statements were properly admitted or were elicited by Appellant, we find no error.
¶ 38 In his tenth proposition of error, Appellant claims he was denied a fair trial because the trial court failed to administer two general closing instructions  OUJI-CR2d 10-2[9] and 10-3.[10] Appellant also claims the jury was misinstructed because the trial court blended OUJI-CR2d 10-13 and OUJI-CR2d 10-24 and altered OUJI-CR2d 10-27 concerning the jury's consideration of murder in the second degree. Because Appellant failed to object, we will review for plain error. Cannon, 1998 OK CR 28, at ¶ 32, 961 P.2d at 848.
¶ 39 "This Court has repeatedly held that it will not disturb a verdict if the instructions, taken as a whole, accurately state the applicable law." Cannon, 1998 OK CR 28, at ¶ 41, 961 P.2d at 850. A review of the instructions administered shows the omission of OUJI-CR2d 10-2 and 10-3 did not deprive Appellant of a fair trial and the jury was instructed on all salient points of the pertinent law. The jury was advised that Appellant was charged with first degree murder, that he was presumed innocent, that the State had the burden of proof and that the jury's verdict must be unanimous. The jury was further instructed that it should consider first degree murder and if it entertained a reasonable doubt, then it should consider second degree murder as is required by OUJI-CR2d 10-24. Because the instructions taken as a whole sufficiently advised the jury of the applicable law and its *974 role, we find no plain error occurred. Accordingly, this proposition is denied.
¶ 40 In his eleventh proposition of error, Appellant claims prosecutorial misconduct in both stages of trial deprived him of a fair trial and sentencing proceeding. Appellant argues the prosecutor improperly argued facts not in evidence, misstated the evidence, made speculative arguments solely to inflame the jury, ridiculed him, asked improper questions during cross-examination, improperly invoked sympathy for the victim and injected personal opinions on punishment, the justice system and the jury's moral duty to find for the State. Because Appellant failed to object to the comments about which he now complains, this Court will review for plain error. Douglas, 1997 OK CR 79, at ¶ 74, 951 P.2d at 673.
¶ 41 This Court looks at the entire record to determine whether the cumulative effect of improper comments by the prosecutor prejudiced an appellant, thereby constituting plain error. Romano v. State, 1995 OK CR 74, ¶ 54, 909 P.2d 92, 115, cert. denied, 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996). "Allegations of prosecutorial misconduct will not cause a reversal of judgment or modification of sentence unless their cumulative effect is such as to deprive the defendant of a fair trial and fair sentencing proceeding." Spears v. State, 1995 OK CR 36, ¶ 60, 900 P.2d 431, 445, cert. denied, 516 U.S. 1031, 116 S.Ct. 678, 133 L.Ed.2d 527 (1995).
¶ 42 This Court has consistently stated that in closing argument both the State and the defendant have the right to freely discuss the evidence from their respective viewpoints. Romano, 1995 OK CR 74, at ¶ 56, 909 P.2d at 116. A review of the first stage closing argument and the prosecutor's questions during cross-examination shows that the majority of the statements about which Appellant complains were fair comment or questions based on the evidence. The prosecutor's questions and argument were based on fair inferences from the evidence that Appellant went to the laundry with the intent to kill Washington and shot her eight times as she tried to get away from him before he delivered the fatal shot. We find the remaining remarks, though error, did not contribute to the verdict in first stage. Accordingly, this proposition is denied.

SECOND STAGE ISSUES
¶ 43 We now review the evidence in aggravation and those claims that require relief in this case. In his fourteenth proposition of error, Appellant alleges the evidence was insufficient to prove the murder of his ex-wife was especially heinous, atrocious or cruel, the sole aggravating circumstance found by the jury. Appellant relies on Cheney v. State, 1995 OK CR 72, 909 P.2d 74 and Brown v. State, 1988 OK CR 59, 753 P.2d 908 to argue the State failed to prove the existence of any conscious physical suffering or torture as the medical examiner could not determine the order the shots were inflicted and Washington died "in less than a minute" from when the first shot was fired. See Appellant's Brief at 85.
¶ 44 When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, this Court reviews the evidence in the light most favorable to the State to determine if any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt. Le v. State, 1997 OK CR 55, ¶ 32, 947 P.2d 535, 551, cert. denied, 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998). In Cheney, 1995 OK CR 72, at ¶ 15, 909 P.2d at 80, we reiterated the elements that must be present to prove that a murder was especially heinous, atrocious or cruel:
[T]his Court has limited this aggravating circumstance to cases in which the State proves beyond a reasonable doubt that the murder of the victim was preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty. "Absent evidence of conscious physical suffering of the victim prior to death, the required torture or serious physical abuse standard is not met." As to the extreme mental cruelty prong of this aggravating circumstance, "torture creating extreme mental distress must be the result *975 of intentional acts by the defendant. The torture must produce mental anguish in addition to that which of necessity accompanies the underlying killing. Analysis must focus on the acts of the defendant toward the victim and the level of tension created." (citations omitted.)
(emphasis added).
¶ 45 This aggravator cannot be upheld based on a finding of extreme mental cruelty in this case. "The mental torture element is confined to cases in which the victim is terrorized for a significant period of time before death." Cheney, 1995 OK CR 72, at ¶ 19, 909 P.2d at 81. In this case there is no such evidence of mental torture during the brief encounter between Washington and Appellant. Washington's fear was no different than the fear suffered by any other victim who is facing the prospect of death. Therefore, this aggravator can only be upheld if there is evidence the victim consciously suffered.
¶ 46 It was uncontroverted in this case that only four minutes elapsed between the time Smith dialed 9-1-1 until Sgt. Jestice saw Appellant leaving the laundromat. In that time, Appellant entered the laundromat heading for the office, saw Smith on the telephone and walked toward him until Smith hung up the receiver. The open line of the 9-1-1 call lasted approximately one minute. (St's Exh. 60) Smith then retrieved his personal laundry and saw Appellant motioning for Washington to come out of the office. Appellant followed Smith out of the laundromat and down the sidewalk until Smith went into his apartment next door some 50 to 60 feet from the laundromat. Appellant re-entered the laundromat, broke into the office, struggled with Washington and shot her eight times. Appellant then walked to his car in the business parking lot just south of the laundromat and was leaving that parking lot as Sgt. Jestice arrived.
¶ 47 The medical examiner testified he could not determine in what order the eight gunshot wounds were inflicted or in what position the body was when it received the wounds. The medical examiner testified the victim sustained four shots that entered from the front of the victim's body and four from the rear. He did note the bullet that entered Washington's right thigh broke her femur. He concluded that the victim could have been rendered immediately unconscious by either of the two head wounds she sustained. Because he could not determine the order the wounds were inflicted, he could not render an opinion on whether Washington consciously suffered prior to her death.
¶ 48 Sgt. Jestice testified he believed the victim crawled underneath the table based on the position of the body under the table and the chair "wedged" in front of her. He further believed there had been a struggle based on overturned objects in the small office. This evidence arguably supports the State's theory that Washington struggled with Appellant and tried to evade him, possibly crawling after a bullet pierced Washington's femur, as he systematically shot her. As such, we find the evidence in this case is sufficient to sustain the jury's finding of this aggravating circumstance.
¶ 49 However, this case illustrates the difficulty reviewing courts and juries face when, as in this case, the encounter between the accused and the victim lasted no longer than a minute and there is no medical evidence to prove the victim consciously suffered. We certainly do not suggest that there is some minimum amount of time that a victim must consciously suffer or that conclusive medical evidence is required before this aggravator is proved. However, the longer the confirmed conscious suffering, the stronger the evidence is in aggravation warranting the ultimate penalty. Since the victim in this case did not consciously suffer for more than one minute and there is no other aggravating evidence, the evidence in aggravation, although present, is not abundant and such factor must be considered when reviewing other errors and applying any harmless error analysis.
¶ 50 In his twelfth proposition of error, Appellant alleges he was denied competent trial counsel in violation of the Sixth Amendment. Appellant argues trial counsel was deficient because he failed to object to the admission of the search warrant and its affidavit, prejudicial photographic evidence, irrelevant crime scene evidence, the blood evidence, *976 inadmissible hearsay, improper expert testimony, prosecutorial misconduct and the jury instructions. Counsel further failed to object to evidence admitted from Appellant's arrest and to the admission of Appellant's statements based on voluntariness. Appellant also claims counsel failed to adequately prepare, investigate and use available evidence during both stages of trial.
¶ 51 "To prevail on a claim of ineffective assistance of counsel, Appellant must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance by showing: [1] that trial counsel's performance was deficient; and [2] that he was prejudiced by the deficient performance." Humphreys, 1997 OK CR 59, at ¶ 40, 947 P.2d at 577-78. "To establish prejudice, Appellant must show a reasonable probability that, but for trial counsel's errors, the result of his [trial] would have been different." Humphreys, 1997 OK CR 59, at ¶ 40, 947 P.2d at 578. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).
¶ 52 As discussed in Propositions V, VI, VII and VIII, supra, the trial court did not err in admitting the lay opinions of the medical examiner or the two police officers, the photographs of the victim, the physical evidence, the state-of-mind and excited utterance statements of the victim or evidence from Appellant's arrest including his statements. As discussed in Propositions X and XI, supra, Appellant was not prejudiced by the prosecutor's remarks in first stage or the trial court's instructions. Because we have found no prejudicial error when reviewing these substantive claims, Appellant cannot meet his burden and his ineffective assistance of counsel claim must fail based on these allegations.
¶ 53 However, Appellant makes a compelling argument that trial counsel was deficient because he failed to use available evidence to rebut the aggravator "the murder was especially heinous, atrocious or cruel," to mitigate punishment, to object to the prosecutor's improper argument and to object to the admission of improper victim impact evidence all to Appellant's detriment.
¶ 54 Pursuant to Rule 3.11(B)(3)(b), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (1998), Appellant filed an application for an evidentiary hearing and to supplement the record with additional material to show counsel's deficiencies.[11] Because we find Appellant has met his burden based on the record before this Court, we deny his request for an evidentiary hearing.
¶ 55 The record before this Court shows counsel did little to contest the State's case in second stage. He did not make an opening statement, but tried to demur to the State's case after the State's second stage opening statement. He acquiesced to the admission of the so-called victim impact evidence including a letter from Washington's father calling for an eye for an eye and an emotional appeal to impose the death penalty. Counsel did not introduce any evidence in second stage either to rebut the alleged aggravating circumstances or to mitigate punishment. Rather, counsel simply relied on *977 the testimony he elicited from Appellant during first stage to argue Appellant did not deserve death because he served in the military, he did not have a history of criminal acts, he did not resist the police and he was under emotional stress at the time of the shooting.
¶ 56 During his disjointed and rambling closing argument, trial counsel did not contest the evidence in aggravation, but rather argued all murders are heinous, atrocious or cruel and this one was really no different. At no time did trial counsel argue or question witnesses about the time frame to show the encounter between Appellant and Washington did not last four minutes as argued by the State or that Washington could not have consciously suffered for more than a minute, if at all, based on the evidence. Nor did he question how Washington received numerous wounds to the front of her body if she was crawling away from Appellant as the State claimed. Further, the record shows trial counsel failed to question witnesses about or argue how the physical evidence equally supported Appellant's version of events. Instead, counsel stipulated to the expertise of several key state witnesses and engaged in perfunctory cross-examination. Consequently, counsel allowed the State to submit its uncontested theory that Appellant systematically shot Washington in non-vital areas as she crawled away from him over four minutes before delivering the fatal shot in a case where the evidence in aggravation was nominal.[12]
¶ 57 Trial counsel also failed to object to the admission of the victim impact evidence. Because the heart of an ineffective assistance of counsel allegation is the predicate substantive claim which counsel purportedly mishandled, we must review the merits of Appellant's substantive claim to determine if he has met his burden to prove counsel's performance was deficient and he was prejudiced from the deficient performance. Unless an appellant can meet his burden on the ineffective assistance of counsel claim, the substantive claim remains waived.
¶ 58 In the penalty phase of Appellant's trial, the State introduced two letters that were termed "impact" or "victim impact" evidence. One of the letters was a letter written by the victim to her parents and the other was a letter written by the victim's father to the district attorney. The State's entire second stage case consisted of incorporating the evidence from the first stage of trial and the admission of these two letters which were read to the jury by the district attorney. As stated above, the defense presented no evidence in second stage and waived opening statements.
¶ 59 This Court has held that both sworn "victim impact statements" and "victim impact evidence" are admissible in the penalty phase of a capital trial. Willingham, 1997 OK CR 62, at ¶ 58, 947 P.2d at 1086; Toles v. State, 1997 OK CR 45, ¶ 39, 947 P.2d 180, 189, cert. denied, 524 U.S. 958, 118 S.Ct. 2380, 141 L.Ed.2d 746 (1998); Cargle v. State, 1995 OK CR 77, ¶ 75, 909 P.2d 806, 828, cert. denied, 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996). Such "[v]ictim impact evidence is intended to provide a `quick glimpse' of a victim's characteristics and the effect of the victim's death on survivors." Le, 1997 OK CR 55, at ¶ 38, 947 P.2d at 551. We have concluded that victim impact evidence should be restricted to the financial, emotional, psychological, and physical effect of the crime itself on survivors and include a few personal characteristics of the victim. Id. See also Toles, 1997 OK CR 45, at ¶ 38, 947 P.2d at 189. The admissibility of victim impact evidence is limited by all of the appropriate rules of evidence and criminal trial procedure and may be presented as a narrative or in a question-answer format. Toles, 1997 OK CR 45, at ¶ 39, 947 P.2d at 189. "In either case the declarant shall testify and be subject to cross-examination." Id.
¶ 60 Appellant correctly points out that the letter written by Washington to her parents *978 does not constitute impact evidence as it was written prior to the murder and does not address how Washington's murder affected her family. The type of evidence contemplated by 21 O.S.Supp.1992, § 701.10(C) and 22 O.S.Supp.1993, § 984 "is restricted to the impact of the homicide on the victim's family members." Gilbert v. State, 1997 OK CR 71, ¶ 68, 951 P.2d 98, 117, cert. denied, ___ U.S. ___, 119 S.Ct. 207, 142 L.Ed.2d 170 (1998). While Washington's letter to her parents arguably is evidence about some personal characteristics of the victim in that it showed Washington was a person who was working and trying to put her life together in the midst of her divorce and who maintained a relationship with her parents, the letter is hearsay for which no exception applies and its admission was error under Toles, 1997 OK CR 45, at ¶ 39, 947 P.2d at 189. See also 12 O.S.1991, § 2804. Further, we have held that to be relevant, evidence of personal characteristics must show how the loss of the victim will financially, emotionally, psychologically, or physically affect or might affect the victim's survivors and why the victim should not have been killed. Hain v. State, 1996 OK CR 26, ¶ 51, 919 P.2d 1130, 1144, cert. denied, 519 U.S. 1031, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996). Thus, to mischaracterize, label and admit this letter as victim impact evidence was error.
¶ 61 The letter written by the victim's father to the district attorney exceeded the bounds of permissible victim impact evidence given the overamplified request for the death penalty and the biblical references.[13] A review of this letter shows, and the State concedes, the recommendation of the death penalty was not a straightforward concise statement without amplification and was error.[14] This Court must determine if the letter was so emotional or excessive as to cause the jury to render a sentence that was not a reasoned moral response in violation of due process and if so counsel was ineffective in failing to object to its admission.
¶ 62 We have condemned prosecutors who attempt to make the capital sentencing decision somehow easier by implying God is on the side of a death sentence as an intolerable self-serving perversion of Christian faith as well as the criminal law of Oklahoma. Long, 1994 OK CR 60, at ¶ 48, 883 P.2d at 177. We can neither permit such references in victim impact evidence because victim impact evidence is limited to the financial, emotional, psychological, and physical effect of the crime itself on survivors and recommendations on punishment should be concise statements *979 of the recommendation without amplification and reference to a higher power. Deviating from these rules allows reversible error to creep in and invalidate an otherwise valid conviction and sentence and defense counsel must be vigilant in excluding victim impact evidence that exceeds the bounds of the narrow type of victim impact evidence that is admissible.
¶ 63 Lastly, Appellant claims counsel was deficient because counsel failed to object to the prosecutor's second stage closing argument in which the prosecutor exceeded the bounds of proper argument by invoking societal alarm and improperly arguing the jury had a duty to impose death based on the prosecutor's personal sense of justice. In McCarty v. State, 1988 OK CR 271, ¶¶ 12-14 and 16, 765 P.2d 1215, 1220-21, this Court found, among other errors, that the prosecutor improperly expressed his personal views by arguing the jury had a responsibility to convict on the basis of the prosecutor's personal sense of justice[15] and that the prosecutor improperly expressed his personal opinion as to the death penalty.[16] Three of the remarks in the instant case were borderline.[17] However, the final closing argument contains remarks[18] strikingly similar to those condemned in McCarty. As in McCarty, the argument in this case was not based on evidence supporting any alleged aggravating circumstance, but was simply a statement of the prosecutor's personal opinion as to the appropriateness of the death penalty. McCarty, 1988 OK CR 271, at ¶ 14, 765 P.2d at 1221. Such argument is clearly improper. Id. See also Brown v. State, 1988 OK CR 59, ¶ 16, 753 P.2d 908, 913.
¶ 64 The question of whether the improper argument of the prosecutor or the admission of the improper victim impact evidence rises to the level of plain reversible error, in and of itself, need not be determined inasmuch as it is the combination of this improper argument, the admission of improper victim impact evidence and the deficient performance of trial counsel that mandates relief. We believe that any attorney, acting in a prudent and effective manner, would not have chosen the course of inaction that Appellant's counsel employed and would *980 have contested the State's aggravating evidence and objected to the improper argument of the prosecutor and to the admission of the so called victim impact evidence. Adversarial testing is the bedrock of our criminal justice system which necessarily requires the effective assistance of counsel. Effective assistance of counsel is as important in the penalty phase of a trial, especially a capital trial, as it is in the determination of guilt or innocence. When counsel's failure to subject the State's case in aggravation to adversarial testing is coupled with the admission of improper victim impact evidence and the prosecutor's prejudicial argument, we find such errors in combination deprived Appellant of a fair and reliable sentencing proceeding and the conscience of this Court cannot permit the death sentence to stand. After careful review of the record before us, we find the appropriate remedy in this case is to vacate Appellant's death sentence and modify Appellant's sentence to life imprisonment without the possibility of parole.
CHAPEL, P.J., and JOHNSON, J., concur.
LUMPKIN, J., and LILE, J., concur in part/dissent in part.
LUMPKIN, Vice-Presiding Judge: concurs in part/dissents in part.
¶ 1 I concur with the Court's decision to affirm the conviction in this case, however, while I agree some error occurred in the punishment phase of the trial, a jury should be allowed to make the decision as to the appropriate sentence in a resentencing proceeding rather than this Court modifying to Life Without Parole.
¶ 2 Initially, the Court spends too much time in its discussion of Appellant's fourth proposition of error regarding the second degree murder instructions. In Willingham v. State, 947 P.2d 1074, 1081-82 (Okl.Cr.1997) this Court held that murder in the second degree is not a lesser included offense to malice murder. That should be the Court's analysis of Appellant's allegation of error as to the instructions. Appellant in this case received more than he was due by the trial court giving a second degree murder instruction. Therefore, based on a plain error review, there is no error as to this proposition.
¶ 3 I disagree with the Court's analysis concerning the second stage issue contesting the especially heinous, atrocious or cruel aggravator in this case. As the Court correctly states at ¶ 44 "when the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, this Court reviews the evidence in the light most favorable to the State to determine if any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt. Allen v. State, 1996 OK CR 9, ¶ 39, 923 P.2d 613, 621." The Court then proceeds to dismiss the mental torture element of the "especially heinous, atrocious or cruel" aggravator based on an accounting of minutes. Any person who has taken the time to watch the second hand on a watch sweep through sixty seconds, realizes that one minute, in and of itself, can be an extended period of time. When those sixty seconds are accompanied by threats, physical abuse, and gunshots into the body, the excruciating nature of the passing second hand is amplified. Therefore, this Court should never render a decision which in some way appears to set a specific number of seconds or minutes which must elapse prior to a victim being deemed to have experienced mental torture prior to succumbing to the actions of a murderer. As Judge Lile has pointed out in his separate writing, the evidence reveals a time line involving mental torture which extends beyond that taken into consideration by the Court in this opinion. It is because of this fact situation that I cannot accept the Court's statement at ¶ 45 "in this case there is no such evidence of mental torture during the brief encounter between Washington and Appellant. Washington's fear was no different than the fear suffered by any other victim who is facing the prospect of death."
¶ 4 The facts presented in aggravation are sufficient, when reviewed under the standard set forth in Allen, 923 P.2d at 621, to support the aggravator of "especially heinous, atrocious, or cruel," both as to the mental torture element and the conscious physical suffering. Therefore, this Court should allow a jury to make the determination as to whether or not *981 that sufficient evidence, when considered with any mitigation evidence presented by the defendant, warrants the death penalty in this case. I do not believe the Court has properly analyzed the body of evidence which is available in this case and has given too much weight to its concern about the number of minutes that passed rather than the acts which were committed by the defendant in this case, both prior to and during the homicide.
¶ 5 I agree with the Court that several errors occurred during the course of trial counsel's second stage representation. However, the Court continues to cite an improper standard of review regarding claims of ineffective assistance of counsel. The criteria set out in Strickland v. Washington 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for evaluating effectiveness of counsel has since been further explained in Lockhart v. Fretwell, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). As the Court said in Lockhart,
[an appellant] alleging prejudice must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S., at 687, 104 S.Ct., at 2064; see also Kimmelman v. Morrison, 477 U.S. 365, 374, 106 S.Ct. 2574, 2582, 91 L.Ed.2d 305 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect"); Nix v. Whiteside, 475 U.S. [157], at 175, 106 S.Ct. [988], at 998[, 89 L.Ed.2d 123 (1986)]. Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him. See [United States v.] Cronic, 466 U.S. [648], at 658, 104 S.Ct. [2039], at 2046[ 80 L.Ed.2d 657 (1984)].
506 U.S. 364, 113 S.Ct. 838, 842-43, 122 L.Ed.2d 180, 189 (1993) (footnote omitted). Although we must consider the totality of the evidence which was before the factfinder, our "ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." Strickland, 466 U.S. at 696, 104 S.Ct. at 2069; Fisher v. State, 736 P.2d 1003, 1012 (Okl.Cr. 1987). Therefore, applying the Lockhart standard, the Court should determine whether the trial was rendered unfair and the verdict rendered suspect or unreliable, based on the actions of trial counsel.
¶ 6 In this case, several errors occurred by trial counsel relating to both pre-trial and penalty phase issues. In addition, the State's failure to adhere to the requirements established by this Court regarding victim impact evidence constituted error which could have been alleviated had the proper procedures been followed. See Cargle v. State, 909 P.2d 806 (Okl.Cr.1995), cert. denied, 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996). First, as the opinion notes at footnote 15, the State failed to comply with the requirements of Cargle and the Court failed to hold an in camera hearing to determine the admissibility of the victim impact evidence. Had the proper notice been given and the hearing conducted in accordance with the procedure we set out in Cargle, the improper evidence admitted as victim impact evidence would not have been admitted at trial.
¶ 7 I disagree to an extent with the Court's characterization as to what would be admissible and not be admissible in the letter submitted by the victim's father. However, I agree that a small portion of that letter was not appropriate within the context of victim impact evidence. The real issue concerning the letter is the right of confrontation which was not raised, as we discussed in Conover v. State, 933 P.2d 904, 923 (Okl.Cr.1997). However, as we recently set out in Short v. State, 1999 OK CR 15 that right can be waived and may be a matter of trial strategy. Due to the fact an in camera hearing was not conducted prior to the admission of the evidence in this case, this Court has not been presented with a record which would allow us to answer that question.
¶ 8 Second, once again, an error was made as it related to the failure to present evidence *982 in mitigation. In Wallace v. State, 893 P.2d 504, 512-13 (Okl.Cr.1995), this Court set out a procedure to be followed by a defendant and counsel if an election was made not to present mitigating evidence. The trial court failed to require defense counsel to make that showing and the record before us does not answer the question of why the mitigation evidence was not presented. Because of these errors, I agree this case should be remanded for resentencing. I agree with Judge Lile the evidence presented is sufficient to support the aggravator and to sustain the sentence of death. However, because potential mitigation evidence was not presented and there is not an appropriate waiver of that evidence in the record, I concur a resentencing is necessary. There is great potential that a trier of fact would find the evidence sufficient, and the proper mitigation evidence, when weighed against the aggravating evidence, would not mitigate the determination that a death sentence was still appropriate.
¶ 9 Further, in ¶ 57 addressing trial counsel's failure to object to the admission of the victim impact evidence, it appears this Court has improperly applied the standard of review for ineffective assistance of counsel claims utilized in Capital Post-Conviction cases. See Walker v. State, 933 P.2d 327, 333-34 (Okl.Cr.), cert. denied, 521 U.S. 1125, 117 S.Ct. 2524, 138 L.Ed.2d 1024 (1997). The review should be one for plain error based upon counsel's failure to raise an objection. See Short, 1999 OK CR 15, ¶ 61, 980 P.2d 1081 citing Simpson v. State, 876 P.2d 690, 698-699 (Okl.Cr.1994) (counsel's failure to raise an objection to a newspaper article offered as victim impact evidence waived all but plain error review). In addition, I cannot join in some of the syntax utilized to discuss the appropriate content of the victim impact testimony. The Court seemed to be hypersensitive to the use of the reference to the Bible by the victim's father in his letter when he wrote "our Bible say's (sic) eye for eye." The issue should not be the source of a quote but whether the argument or evidence goes to an emotional response, rather than one based on the law and facts. Accountability and personal responsibility is well documented in the scriptures and history reveals those principles served as the foundation for the body of law we apply today. Whether the reference is to the Bible or Thoreau, the focus should be on the response sought rather than the source of the quote.
¶ 10 I agree with the Court's discussion that a substantial amount of improper argument was presented to the jury by the prosecution in this case. As we have noted before it continues to confuse this Court why the State would seek to "snatch[] defeat from the jaws of victory" through improper comment. Tucker v. State, 499 P.2d 458, 461 (Okl.Cr.1972). See also Pickens v. State, 850 P.2d 328, 344 (Okl.Cr.1993); Sandersfield v. State 461 P.2d 1019, 1020 (Okl.Cr.1969). Such is the case here. The issue of guilt is undisputed by the evidence. The issue of proof of the aggravating circumstance beyond a reasonable doubt is sufficient to meet that requirement. The greatest example of professionalism is to strongly advocate within the scope of the rules of advocacy. Failure to adhere to those rules denigrates the entire judicial process. Therefore, I agree the sentence of death must be vacated, but join with Judge Lile in urging its remand for resentencing so that a jury can make the appropriate determination as to the sentence warranted by the law and evidence in this case.
LILE, J.: concurs in part/dissents in part:
¶ 1 I concur that the judgment of guilt should be affirmed. I disagree with the modification of sentence. When sufficiency of the evidence of an aggravating circumstance is challenged on appeal, we review the evidence in the light most favorable to the state to determine if any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt. In this case, the jury was properly instructed that "heinous means extremely wicked or shockingly evil," that "atrocious means outrageously wicked and vile," that "cruel means pitiless or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others," and further that this aggravator "is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse." Torture may be physical or mental *983 or a combination thereof. There is evidence in the record from which the jury could properly have determined that the victim feared her ex-husband, (i.e. she left the marital home leaving many of her personal effects behind; she withheld from him her whereabouts during the divorce; she expressed fear of him to her supervisor at work; on the day of her death, she told a co-worker that she was afraid her ex-husband would come to her job and hurt her; when seeing her ex-husband in the parking lot, she told the co-worker to call 911 while she ran and locked herself in the office; the defendant tried to coax her out of the office unsuccessfully and finally kicked in the door).
¶ 2 There is abundant evidence from which the jury could properly have concluded that the defendant physically and mentally tortured his ex-wife, (i.e. only one contact head wound was fatal, all other 7 wounds were in non fatal portions of her body, being both arms, both legs, abdomen, etc., all of which the jury may have concluded were inflicted prior to the fatal, execution style contact wound; it appeared a struggle occurred in the office; an earring had been torn from the victim's ear lobe; the victim was found under a table in the office as though she was trying to get away from the defendant; the evidence indicates that the fatal shot was administered after she went under the table; the incident went on long enough for the defendant to eject one spent clip and insert a second). A review of the record discloses abundant competent evidence to support the jury's findings with regard to this aggravator.
¶ 3 I have searched the record for evidence that trial counsel's performance was deficient to the point that the results of the trial were probably changed and find none. Counsel is chastised for not objecting to the state's victim impact evidence when by agreeing he has a letter from the deceased saying in effect that the defendant is a nice guy, and he also has a letter rather than a live appearance from the victim's father. Counsel is chastised for not putting on witnesses in the second stage, although he has successfully established through the state's own witnesses that his client has no criminal record, works for the post office, has been a law abiding citizen all his life, spent 12 years in the military, further that the victim was a prostitute until she married the defendant, etc. I have reviewed the Appellant's application for an evidentiary hearing, which includes evidence which Appellant now says counsel should have used on his behalf at trial and find nothing that was not established at trial or that is likely to have changed the outcome of the trial. Counsel is chastised for not contesting shot by shot the state's theory of what happened during the shooting. Having read the transcript of the trial and the affidavit of Lisa Cooper, Appellant's police officer/technical investigator now OIDS investigator, it is clear to me that such a thorough and protracted examination into the exact choreography of the fatal assault might well have made for a very long and difficult day in court for the Appellant.
¶ 4 In my opinion Appellant received a fair trial and the conviction and sentence should be affirmed. Further, even if I were convinced that the punishment stage of this trial was deficient, I would remand for re-sentencing rather than put myself in the stead of a jury by modifying to life without parole.
NOTES
[1] 21 O.S.1991, § 701.12(4).
[2] Appellant's Petition in Error was filed in this Court on June 18, 1997. Appellant's brief was filed May 18, 1998, and the State's brief was filed September 18, 1998. A reply brief was filed on October 6, 1998. The case was submitted to the Court on September 25, 1998. Oral argument was held December 1, 1998.
[3] Inasmuch as we are granting relief, we will only address the merits of first stage claims and those second stage claims that are necessary to the disposition of this case and require the modification of Appellant's sentence.
[4] "Adequate provocation" refers to any improper conduct of the deceased toward the defendant which naturally or reasonably would have the effect of arousing a sudden heat of passion within a reasonable person in the position of the defendant. Generally, actions which are calculated to provoke an emotional response and ordinarily cause serious violence are recognized as adequate provocation. Actions that do not ordinarily provoke serious violence do not constitute adequate provocation. In determining whether the deceased's conduct was adequate provocation, the conduct is judged as a person of reasonable intelligence and disposition would respond to it. Mere words alone, or threats, menaces, or gestures alone, however offensive or insulting, do not constitute adequate provocation. However, words, threats, menaces, or gestures, when considered in connection with provoking conduct of the deceased, may constitute adequate provocation. Personal violence or aggression by the deceased of a nature sufficiently violent to cause or threaten to cause pain, bloodshed, or bodily harm to the defendant may be adequate provocation. See OUJI-CR2d 4-98.
[5] The trial court stated:

I don't believe that what occurred here rises to provocation. He goes to her place of employment and she's trying to stay away from him and he kicks the door down, breaks the door down and goes in and grabs her and shoots her eight times is no adequate provocation in my opinion. (Tr.IV 189)
[6] Instruction No. 21 provided in pertinent part:

If you find the defendant not guilty of Murder In The First Degree then and only then you shall consider the lesser included crime of Murder In The Second Degree . . . . (O.R.259)
[7] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[8] 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). "Jackson requires a separate hearing by the trial judge concerning the admissibility of a defendant's confession once the voluntariness of that confession has been brought into question." Smith v. State, 1987 OK CR 75, ¶ 4, 736 P.2d 531, 533.
[9] OUJI-CR2d 10-2 provides:

It is your responsibility as jurors to determine the facts from the evidence, to follow the rules of law as stated in these instructions, to reach a fair and impartial verdict of guilty or not guilty based upon the evidence, and to determine punishment if you should find the defendant guilty as you have sworn you would do. You must not use any method of chance in arriving at a verdict, but must base your verdict on the judgment of each juror.
[10] OUJI-CR2d 10-3 provides in pertinent part:

The defendant is charged in the Information with [name of crime] on or about [date] in [county], Oklahoma. To this charge the defendant has entered a plea of not guilty.
[11] Appellant includes, among other things, affidavits from people who knew him and would have been willing to testify about his good character during second stage (Exh. P, Q, R, S, T), an affidavit from a person who would have testified that Appellant was distressed over his divorce (Exh. U), affidavits from people who could testify that Appellant showed remorse and expressed a willingness to cooperate with the police (Exh. AA, BB), a report from Joyce Turner, a licensed social worker, detailing Appellant's abusive, disadvantaged background (Exh. O) and a report from Lisa Cooper, former Midwest City police officer/technical investigator turned Oklahoma Indigent Defense System investigator, detailing her investigation of the physical evidence and crime scene (Exh. H). In Cooper's report, she finds the physical evidence supports Appellant's version that Appellant shot Washington as they argued/struggled and contradicts the State's theory that Washington was crawling away from Appellant while he inflicted torture wounds and then the fatal shot. Cooper conducted tests which show nine aimed shots hitting a target and including a reload can be delivered in less than 15 seconds thereby contradicting the State's argument that Appellant tortured Washington slowly. Also included in the supplemental materials is a letter from Washington's parents that Appellant received shortly after the murder stating the victim's father, Cleve Menifee, had not spoken ill of Appellant and that Menifee was sure Appellant had his reasons for shooting Washington.
[12] While some may argue counsel was somewhat effective given that the jury did not find Appellant constituted a continuing threat to society, the other aggravator alleged, the record shows the jury did not find this aggravator because the State did not introduce one shred of evidence to show Appellant had any pattern of criminal conduct that would likely continue in the future since Appellant had no prior criminal history at all.
[13] "District Attorney"

My name is Cleveland Menifee, I' am a 68 yr old disabled man with a heart condition, so serious I have been put on a list waiting for a heart transplant. The senseless murder of my daughter has hurt me so gravely, physically & mentally. She was my only baby, and was taken away so inhumanly. I would like to request. If I'm allowed to do so legally ! that Curtis Washington recieved (sic) the maximum penalty, no leenity (sic), no plea bargains. No life. Death as he took it. Our Bible say's eye for eye. Its very difficult living out of state. I was not even able to attend my baby's funeral as the shock put me in "intestive (sic) care coronary unit" at Long Beach Memorial Hospital for 10 days. Can you please keep me updated on the S.O.B. Prosecution. I have to know the why's? What for? How could you. Stolen distroyed (sic) family. I'm a old man. When you become a so so called a geriac (sic) citizen you need your children to help take care of you emotionally, phyically (sic) mentally and often fianacially (sic). But our plans & dreams won't come true. I loved my daughter very much. My wife as a birthday present for my 68 birthday had Celia flown out here my present, my baby. Please just accomlish (sic) the right Godly justice. Thank you for you(sic) time. Forgive my spelling, not not good letter, I just dont' know what I can do should do, or how it to be done. Please help me! Signed: Cleveland Menifee
[14] It should be noted that the procedural safeguards to avoid the admission of improper victim impact evidence outlined in Cargle were not followed. Specifically, the State did not file a Notice of Intent to Offer Victim Impact Evidence although the victim's father was listed as a witness on the State's second stage witness list and the State provided Appellant with a synopsis of his testimony referencing the letter. (O.R.174, 179) Further, the trial court failed to hold an in camera hearing to determine the admissibility of the victim impact evidence utilizing 12 O.S.1991, § 2403 or to make its ruling that one or more aggravating circumstances were present from the record before the court. Cargle, 1995 OK CR 77, at ¶ 76, 909 P.2d at 828.

Appellant also claims as part of this proposition that the letters were not properly authenticated. However, at trial defense counsel did not contest the authenticity of the letters and agreed to their admission. The lack of authentification does not amount to plain error.
[15] "I want justice, ladies and gentleman, and justice is ... that [appellant] be convicted of murder one." Mr. Macy further responded to the jury that "justice demands his conviction of murder one and it does your Honor," "He killed that girl. He needs to pay for it." "You told me that you would seek truth and do justice. I am holding you to it and I want justice, I want a murder one conviction, that man sitting right there."
[16] "[T]his defendant deserves it ... This is a proper case for the death penalty ... and justice demands it."
[17] "I submit to you that this Defendant imposed death on Celia Washington and he deserves that equal punishment." (Tr.V 18)

"I submit to you, there is only one punishment that is just in this case and that is the death sentence, the same sentence that he imposed upon Celia." (Tr.V 20)
"This man is not even remorseful for an intentional murder. He is a continuing threat to society and his just punishment is death." (Tr.V 21)
[18] The prosecutor concluded his final closing argument stating:

Ladies and gentlemen, most people couldn't do to a dog what he did to Celia. It takes a special kind of a man who can look into the face of a woman that he's living with and pump eight bullets into her body with the last one being an execution shot. He just symptomatically (sic) blew her life away. As Mrs. Smith said, next year he'll be 41 and Celia's oldest is going to be 38.
Tortured her. Inflicted horrible pain on her. And then he took what little she had left which was her life. So what is the proper punishment in this case? Mrs. Smith said it would be easy to vote life imprisonment or life imprisonment without parole or you can sit around in prison and go three miles (sic) a day and have visits from his friends. Meanwhile, Celia lies cold in the ground. And her daddy lies out there mourning the loss of his baby. Folks, life, life without parole doesn't even come close to being justice in this case. He brutally tortured and murdered this young lady and he took away everything she had to give. For that he needs to go to death row. He needs to have justice. I want you to go back to the jury room and I want to think about the last four minutes that Celia spent on the face of this earth. And I want you to think about this Defendant because this is a crime where once is enough.
I want you to talk about it. Pray if you need to. Cry if you have to. But when you come back in this jury room bring justice with you. The only way you can see justice in this case is to bring back a verdict of death. (Tr.V 36-37)